## AFFIDAVIT OF DURWIN ELLERMAN
## IN SUPPORT OF A SEARCH WARRANT APPLICATION

I, Durwin Ellerman, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— four electronic devices—described in Attachment A-1, A-2, A-3, and A-4 and currently in law enforcement's possession, and the extraction from that property of electronically stored information described in Attachments B-1 and B-2.

2.    I am currently a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I was deputized as a federal TFO pursuant to 21 U.S.C. § 878 on September 27, 2023, and I am designated by the Attorney General, through approved delegations of authority, to execute and serve search warrants and arrest warrants issued under the authority of the United States. Accordingly, I am serving as a "federal law enforcement officer" as defined in Federal Rule of Criminal Procedure 41(a)(2)(C). Prior to working as a full-time DEA TFO, I was assigned as a Detective at the Burlington, Vermont Police Department (BPD) since November of 2019. I have been a certified full-time law enforcement officer with BPD since May of 2014.

3.    Throughout my assignments, I have investigated or assisted with investigations involving numerous illegal drugs, drug related devices/paraphernalia, and drug related evidence. I have seized or participated in seizures of different quantities of illegal drugs, controlled substances, user paraphernalia and other assorted items, such as money and property related to or acquired through the drug trade. I have seized or participated in seizures of various types of illegal drugs/narcotics during these investigations, to include powder cocaine, cocaine base,

marijuana, heroin, fentanyl, methamphetamine, and numerous types of prescription medications. I have conducted or been involved in multiple drug investigations, and from this experience I am familiar with the trends associated with the use and distribution of illegal drugs/controlled substances. I have conducted frequent controlled purchases of illegal substances utilizing a confidential source. I have also participated in specialized training in which the primary focus was proactive criminal drug enforcement provided by the Vermont Criminal Justice Training Council. This training taught me interdiction techniques and to identify criminal drug activities.

4.      This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The information contained within this affidavit is based upon my training, experience, and investigation, as well as information that has been conveyed to me by other law enforcement officers. The following is either known to me personally or has been related to me by persons having direct knowledge of the events described below, including other law enforcement officers involved in this investigation. Unless otherwise specified, any witnesses' statements included below are related in sum and substance and are not intended to be quotations.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.      The property to be searched are four cellular smartphones (three Apple iPhones and one Samsung phone) seized by law enforcement on July 30, 2025. For ease of reference the devices will be identified as Devices 1, 2, 3, and 4 throughout this affidavit.

6.      Device 1 is a black iPhone with a silver case recovered from Mamodou SOW during a search incident to arrest on July 30, 2025. SOW was arrested during the execution of a Vermont State search warrant at 220 Main St #C in Winooski, Vermont on July 30, 2025.

2

Device 1 is further described in Attachment A-1. Device 1 is currently located in the custody of the U.S. Border Patrol in Swanton, VT under Burlington Police Department (BPD) tag #90923.

7. Device 2 is a black iPhone located inside 220 Main St #C, Winooski, VT during the execution of a Vermont State search warrant on July 30, 2025 (hereinafter "Device 2"). Menderson SILIEN was arrested during the execution of this search warrant. Later processing of this phone determined it belonged to SILIEN as it contained his New York photo identification within the phone's case. Device 2 is further described in Attachment A-2. Device 2 is currently located in the custody of Border Patrol in Swanton, VT under Burlington Police Department (BPD) tag #90901.

8. Device 3 is a pink iPhone with an opaque gray case located inside 220 Main St #C, Winooski, VT during the execution of a Vermont State search warrant on July 30, 2025 (hereinafter "Device 3"). This phone was recovered from Fardosa ADEN's bedroom. ADEN was arrested during the execution of this search warrant. ADEN later provided a description of her phone consistent with this device. Device 3 is further described in Attachment A-3. Device 3 is currently located in the custody of U.S. Border Patrol in Swanton, VT under Burlington Police Department (BPD) tag #90888.

9. Device 4 is a silver Samsung seized from Marcus BROWN during a search incident to arrest on July 30, 2025 (hereinafter "Device 4"). BROWN was arrested during the execution of a Vermont State search warrant at 220 Main St #C in Winooski, Vermont on July 30, 2025. Device 4 is further described in Attachment A-4. Device 4 is currently located in the custody of Border Patrol in Swanton, VT under Burlington Police Department (BPD) tag #90925.

3

10.     The applied-for warrant would authorize the forensic examination of Devices 1, 2, 3, and 4 for the purpose of identifying electronically stored data on each device that is particularly described in Attachments B-1 and B-2.

## PROBABLE CAUSE

11.     The government is investigating Maurice JACKSON, Mamadou SOW, Menderson SILIEN, Marcus BROWN, and Fardosa ADEN for their involvement in a drug trafficking organization in the Burlington, VT area. My review of law enforcement records and my involvement in this investigation regarding JACKSON, SOW, SILIEN, and BROWN shows their involvement in controlled buys involving the sale of controlled substances to a law enforcement confidential source. Fardosa ADEN was identified as an individual who provided transportation and accommodations to JACKSON and his runners. JACKSON, SOW, SILIEN, BROWN, and ADEN were all arrested at ADEN's residence on July 30, 2025, where law enforcement found and seized multiple firearms along with a large quantity of suspected illegal narcotics indicative of drug distribution. Based on the facts set forth in this affidavit, there is probable cause to search Devices 1, 2, 3, and 4 for evidence that relates to violations of federal law that involve JACKSON, SOW, SILIEN, BROWN, ADEN and others, including 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute and distribution of controlled substances), 846 (conspiracy to distribute controlled substances), and 856 (maintaining a drug involved premises).

12.     In September of 2024, the Burlington Police Department (BPD), began an investigation into the cocaine distribution activities of a male known as "Boss" who was later identified as JACKSON.  Reports from cooperating subjects and observations by investigators showed that JACKSON utilized runners to distribute illegal narcotics.  During this investigation, two Burlington Police Department ("BPD") Cooperating Subjects ("CS") were used, hereinafter

4

referred to as "CS1[1]" and "CS2[2]". In September of 2024, CS1 advised investigators that it was in position to purchase cocaine from a male it knew as "Boss." CS1 and CS2 were both advised that if they provided any false information to law enforcement they could face criminal charges. CS1 and CS2 had previously provided information resulting in arrests and search warrants in both State and Federal court. CS1 and CS2 entered into a Cooperating Subject agreement with BPD and agreed to provide active cooperation in exchange for monetary compensation. CS1 stated it knew "Boss" to sometimes utilize runners to deliver the illegal narcotics on his behalf. In my training and experience, it is common for drug dealers to use "runners" or persons other than the individual who arranged the transaction to conduct the drug transaction. This creates a level of separation between the individuals who coordinated the controlled purchase and those who actually conducted the sale.

13.    During the course of this investigation, multiple controlled purchases were conducted with JACKSON, some directly and some via runners. Three of those runners were later identified as Mamodou SOW, Menderson SILIEN, and Marcus BROWN. Fardosa ADEN was identified as an individual who provided transportation and accommodations to JACKSON and his runners. SOW and SILIEN were ultimately identified by name after a July 16, 2025, traffic stop permitted investigators to examine their state-issued IDs. BROWN was identified by name at the time of his arrest on July 30, 2025 based on an examination of his State-issued ID.

---

[1] CS1 has criminal convictions for resisting arrest, 1st degree aggravated domestic, 2nd degree aggravated domestic, 2x misdemeanor depressant, stimulant, narcotic possession < 100 x dose, 3x domestic assault, burglary, misdemeanor retail theft, conspiracy to distribute cocaine base, and two Federal probation violations. CS1 has previously provided reliable information that has led to search warrants and arrests in state court.

[2] CS2 has criminal convictions for heroin possession, false information to a law enforcement officer/implicate another (expunged but still on CS's criminal history), vehicle operation – without owner consent, fraudulent credit card use, and retail theft. CS2 has previously provided reliable information that has led to search warrants and arrests in both state and federal courts.

ADEN was identified by name after her arrest on July 30, 2025 based on an examination of her State-issued ID, and an examination of known vehicles of interest used by JACKSON, SOW, SILIEN, and BROWN revealed that they were registered in her name, as discussed below.

14.     For each of the controlled purchases described below, unless noted otherwise, the following occurred: The identified CS (CS1 or CS2) was searched prior to the drug transaction, at which time he/she was found to have no illegal drugs, paraphernalia, or large sums of money on his/her person.  For each of the controlled purchases, the identified CS was provided prerecorded buy money, fitted with covert video surveillance equipment, and kept under surveillance by law enforcement as he/she entered the area of the anticipated meet location.  The identified CS was also monitored by law enforcement after he/she left the location of each buy and, thereafter the identified CS surrendered the purchased drugs to police, the identified CS was searched and was found to have no illegal drugs, paraphernalia, or large sums of money.  On each occasion, the drugs purchased were field tested and were presumptively positive for the controlled substances as described below with regard to the particular controlled purchase.  After each controlled purchase, the identified CS provided a sworn audio-recorded statement about what transpired, the substance of which is provided below.

## CONTROLLED PURCHASE 1– COCAINE

15.     On a known date during the week of September 22nd, 2024, CS1 told BPD Detective Hartnett that it was in a position to purchase cocaine from "Boss," who was previously identified as JACKSON.  CS1 confirmed it would speak to "Boss" via phone. Detective Hartnett advised the CS that investigators wished to purchase a known amount of cocaine from "Boss."

16.     CS1 met with investigators at a known location in Burlington, VT.  At Detective Hartnett's direction, at a known time, CS1 contacted "Boss" via phone at the number **802-578-**

6

**6860**. CS1 and "Boss" communicated via phone call and arranged to meet at a known location in Burlington, Vermont for the purposes of conducting a drug transaction.

17.     At a known time, BPD Detective Corrow and Detective Hartnett traveled with CS1 to an area close in proximity to the predetermined meet location. Thereafter, CS1 traveled to the predetermined meet location. CS1 was monitored by Detective Corrow, HSI Task Force Officer Willingham, Detective Hartnett, and I as it traveled to the area of the known location in Burlington, Vermont.

18.     TFO Willingham and I observed CS1 meeting with and getting into an Audi bearing Vermont registration KSV360. The vehicle took a short drive with CS1 before CS1 exited the vehicle. Following exiting the vehicle, CS1 then began returning to investigators. A subsequent search of Department of Motor Vehicle records showed the vehicle in question to be registered to ADEN.

19.     Detective Corrow, HSI Task Force Officer Willingham, Detective Hartnett, and I observed the CS as it returned to investigators. Upon meeting with investigators, the CS handed Detective Hartnett the cocaine it had purchased from "Boss".

20.     In their sworn statement CS1 stated it met with "Boss" who was in a vehicle. CS1 stated it entered the vehicle and took a short drive with "Boss". CS1 then exchanged the US Currency provided by investigators for the drugs with "Boss". After CS1 met with "Boss" it traveled directly back to meet with investigators. It should be noted that during this time away from investigators, CS1 was kept under surveillance and confirmed that it did not make any exchanges except with "Boss." CS1 described "Boss" as an overweight black male with facial hair.

7

21.     Back at the Burlington Police Department, Detective Corrow field-tested, the suspected cocaine with a MOBILEDETECT cocaine test pouch.  The substance field-tested presumptive positive for cocaine.  It was tagged into evidence at the Burlington Police Department, tag number 86759.

## CONTROLLED PURCHASE 2– COCAINE

22.     On a known date during the week of July 13th, 2025, CS2 told BPD Detective Hartnett that it was in a position to purchase cocaine from "Boss," who was previously identified as JACKSON.  CS2 confirmed it would speak to "Boss" via phone.  Detective Hartnett advised the CS that investigators wished to purchase a known amount of cocaine from "Boss."

23.     At Detective Hartnett's direction, at a known time, CS2 contacted "Boss" via phone at the number **802-238-6767**.  CS2 and "Boss" communicated via phone call and arranged to meet at a known location in Burlington, Vermont for the purposes of conducting a drug transaction.

24.     At a known time, BPD Detective Corrow and Detective Hartnett traveled with CS2 to an area close in proximity to the predetermined meet location.

25.     Thereafter, CS2 traveled to the predetermined meet location.  CS2 was monitored by Detective Corrow, Detective Congdon, DEA Task Force Officer Ellerman, BPD Detective Sergeant Tremblay, and Detective Hartnett as it traveled to the meet location.

26.     The investigators then observed an Audi bearing Vermont registration KSV360 arrive at the predetermined meet location.  Thereafter, Detective Congdon observed CS2 enter the vehicle.  Detective Congdon then video recorded CS2 exiting this vehicle.  The CS then was observed returning to investigators.  Detective Congdon video recorded this vehicle leaving the area.

8

27.    CS2 returned to our predetermined location and met with Detective Corrow, Detective Congdon, Detective Sergeant Tremblay, Detective Hartnett, and myself. Upon meeting with investigators, the CS handed Detective Hartnett the cocaine it had purchased from the two unknown males

28.    In their sworn statement CS2 stated that CS2 traveled with investigators to an area in close proximity to the anticipated transaction and then proceeded to the agreed transaction meeting location. CS2 stated it was met by two unknown males when it arrived to the area. CS2 then exchanged the US Currency provided by investigators for the drugs with the unknown males. After CS2 met with the unknown males it traveled directly back to meet with investigators. It should be noted that during this time away from investigators, CS2 was kept under surveillance and confirmed that it did not make any exchanges except with the unknown males. CS2 described both males as black males with dreads, and both were wearing white shirts and black pants. CS2 advised one had some facial hair, and the other was approximately 5'10" and 150 lbs in his early 20's. CS2 said that these black males provided it with cocaine and that it turned over all of the purchased cocaine to Detective Hartnett upon meeting with investigators.

29.    The two black males were later identified as SOW and SILIEN by Detective Hartnett after reviewing footage captured on the security body wire and the CS2's post buy statement.  Detective Hartnett identified these individuals based off descriptions provided by CS2 following this controlled purchase and then compared these descriptions and footage captured during surveillance and from the body wire to footage from a traffic stop that occurred on July 16, 2025.  During that traffic stop mentioned below, SOW and SILIEN were occupants of the same motor vehicle used during this controlled purchase.

9

30.    At the Burlington Police Department, Detective Hartnett photographed and field-tested, the suspected cocaine with a SIRCHIE NARK II cocaine test pouch.  The substance field-tested presumptive positive for cocaine.  It was tagged into evidence at the Burlington Police Department, tag number 90621.

## TRAFFIC STOP

31.    On July 16, 2025, Burlington Police Department (BPD) Officer Julian Gonzalez conducted a motor vehicle stop on Vermont registration KSV360, which is a grey Audi A6 registered to Fardosa ADEN, in the area of Perkins Pier in Burlington, VT.  The occupants of the vehicle were identified by Officer Gonzalez as SOW and SILIEN based on a review of their photo identification documents.  The appearances of both males were consistent with those observed during Controlled Purchase 2 and Controlled Purchase 3.

## CONTROLLED PURCHASE 3 – COCAINE

32.    On a known date during the week of July 20th, 2024, CS2 told Detective Corrow and Detective Hartnett that it was in a position to purchase cocaine from "Boss".  CS2 confirmed it would speak to "Boss" via phone at 802-238-6767. Detective Hartnett advised CS2 that investigators wished to purchase a known amount of cocaine from "Boss."  On this occasion, CS2 also noted that an individual it knew only as "DJ" would sometimes answer the previously mentioned 802-238-6767 number.

33.    At Detective Hartnett's direction, at a known time, CS2 contacted an individual via phone at the number 802-238-6767.  CS2 and this individual communicated via phone call and arranged to meet at a known location in Burlington, Vermont for the purposes of a drug transaction.

34.    At a known time, Detective Corrow and Detective Hartnett traveled with CS2 to an area close in proximity to the predetermined meet location.

35.    CS2 then traveled to the predetermined meet location.  CS2 was monitored by Detective Sergeant Tremblay, Detective Hartnett, Detective Corrow, and myself as it traveled to the meet location.

36.    The investigators then observed a Kia bearing Vermont registration KRA286 arrive at the predetermined meet location.  A subsequent search of Department of Motor Vehicle records showed the vehicle in question to be registered to ADEN. Detective Sergeant Tremblay observed and video recorded CS2 enter the vehicle.  Detective Sergeant Tremblay then video recorded CS2 exiting this vehicle.  The CS then was observed returning to investigators.

37.    CS2 was observed by Detective Sergeant Tremblay, Detective Hartnett, Detective Corrow, and TFO Ellerman as it returned to investigators. Upon meeting with investigators, CS2 handed Detective Hartnett the cocaine it stated it had purchased from three males in the Kia.  These three males were later identified as SOW, SILIEN, and BROWN.

38.    In its sworn statement, CS2 stated it was met by the three males when it arrived to the agreed meet location. CS2 then exchanged the US currency provided by investigators for the drugs with the three males. CS2 stated that the three males handed the cocaine between themselves during the transaction before one of the males handed the suspected cocaine to CS2. After CS2 met with the three males it traveled directly back to meet with investigators. It should be noted that during this time away from investigators, CS2 was kept under surveillance and confirmed that it did not make any exchanges except with the unknown males.

39.    At the Burlington Police Department, Detective Hartnett field-tested the suspected cocaine with a SIRCHIE NARK II cocaine test pouch.  The substance field-tested presumptive positive for cocaine.  It was tagged into evidence at the Burlington Police Department, tag number 90735.

40.     During this controlled purchase, two males were captured on the covert video surveillance taken fitted on CS2. Detective Hartnett and I later compared the video footage with the photos from the government issued identification cards issued to SOW and BROWN, and based on that review I believe the individuals in the covert video surveillance to be SOW and BROWN. A third male consistent with SILIEN was later captured on surveillance videos recorded by Det Sgt Tremblay during the controlled purchase. Det Hartnett and I have since compared that video with the photo from the government-issued identification card issued to SILIEN, and based on that review I believe the individual in the video surveillance to be SILIEN.

## VEHICLES OF INTEREST AND GPS WARRANT

41.     During this investigation, multiple vehicles of interest were used during controlled purchases, to include an Audi bearing Vermont registration KSV360 registered to ADEN, a Ford escape bearing Vermont temporary registration W02149J, and a Kia Sorento bearing Vermont registration KRA286 registered to ADEN.

42.     On July 9, 2025, Detective Hartnett applied for and was granted a Vermont State search warrant to monitor the GPS locations of 802-238-6767. An extension was granted on July 18, 2025. During multiple instances of surveillance while these Vermont state search warrants were active, the vehicles of interest were observed to be in locations consistent with the GPS locations of 802-238-6767, including during one controlled purchase.

## SEARCH WARRANT & ARREST

43.     During the course of this investigation, investigators identified the residence of 220 Main St #C in Winooski, VT as a likely stash house for controlled substances.

44.     On July 30th, 2025 at approximately 6:05 AM, the Burlington Police Department executed a Vermont State search warrant at 220 Main St #C, Winooski, VT. JACKSON, ADEN,

SILIEN, SOW, BROWN, and another female and her child (son of JACKSON) were located inside this residence along with a large quantity of suspected illegal narcotics, US currency, and firearms. ADEN later claimed she resided at this residence with her husband, SOW. Detective Sergeant Tremblay later confirmed with the property manager that ADEN is on the lease of this residence. ADEN identified her bedroom as the one on the western side of the apartment (hereinafter referred to as "Bedroom one").

45.    Notable items recovered from 220 Main St #C, in Winooski, VT included:

   a.    Approximately 442 grams in aggregate of both a white rock like and white powdery substance that later tested presumptive positive for cocaine.

   b.    Various denominations of US currency totaling in aggregate $11,396. Of note, recorded currency from the above-mentioned Controlled Purchase 3 was located in Bedroom One, which belonged to SOW and ADEN. Also of note, identity documents belonging to SOW were found in this bedroom.

   c.    Two pistols and ammunition were recovered from Bedroom One.

   d.    Approximately 7.1 grams of a brown powdery substance that later tested presumptive positive for fentanyl from Bedroom One.

   e.    Keys to a motor vehicle that was used in at least one of the controlled purchases found in Bedroom One. This vehicle, a Kia Sorento bearing Vermont Registration KRA286, is also registered to ADEN. This vehicle was located in the parking lot for 220 Main St #C. A later search of this vehicle yielded nothing of value.

   f.    Three digital scales, each of which was covered in a white residue that later tested presumptive positive for cocaine.

g.  Drug paraphernalia to include a razor blade and Pyrex container, with each being covered in a white residue which later tested presumptive positive for cocaine. These items are indicative of the manufacturing or "cooking" of "crack"/cocaine.

h.  The phone (802-238-6767) that was used to arrange the two recent controlled purchases was located in the living room.

46.    SOW, JACKSON, SILIEN, ADEN, and BROWN were all arrested without incident.

47.    Once back at Burlington Police Department, SILIEN waived Miranda and agreed to be interviewed. This interview was captured on Detective Hartnett's audio recorder as well as the audio/video capabilities of the interview room. This is not a complete recounting of the interview, only those relevant pieces. SILIEN stated he had been in Vermont for the past few days for a wedding between ADEN and SOW. SILIEN stated he was from the New York Area. SILIEN was unable to provide more specifics on this wedding, but based off his statements it sounded as if this alleged wedding ceremony had not yet occurred. SILIEN admitted to driving the vehicle in the above-mentioned traffic stop. SILIEN admitted to staying at 220 Main St #C in the area where he was located. SILIEN denied selling illegal narcotics and denied being in the room belonging to SOW and ADEN or JACKSON.

48.    Device 1 was removed from SOW's person during a search incident to arrest following the execution of the above-mentioned search warrant.

49.    Device 2 was located inside 220 Main St #C, Winooski, VT during the execution of a Vermont State search warrant on July 30, 2025. Menderson SILIEN was arrested during the execution of this search warrant. Later processing of this phone determined it belonged to SILIEN as it contained his New York photo identification within the phone's case.

14

50.    Device 3 was located inside 220 Main St #C, Winooski, VT during the execution of a Vermont State search warrant on July 30, 2025.  This phone was recovered from Fardosa ADEN's bedroom.  ADEN was arrested during the execution of this search warrant.  ADEN later provided a description of her phone consistent with this device.

51.    Device 4 was seized from Marcus BROWN during a search incident to arrest on July 30, 2025.

## Storage of Devices

52.    Devices 1, 2, 3, and 4 are currently in the lawful possession of the U.S. Border Patrol in Swanton, Vermont with BPD Evidence tags 90923, 90901, 90888, and 90925.  In my training and experience, I know that the subject devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when the devices first came into the possession of the BPD.  BPD seized these devices on July 30, 2025, pursuant to the above-mentioned Vermont State search warrant.  Following their seizure, the devices were stored at BPD.  On July 31, 2025, the devices transferred to Border Patrol in anticipation of a future Federal search warrant.  Once at Border Patrol, the devices were connected to a forensic extraction device for the sole purpose of preserving the ability to conduct an extraction in the future pending the application of the aforementioned Federal search warrant. The contents of the devices were not accessed.

## Criminal History

53.    I have reviewed JACKSON's criminal history and observed that JACKSON has a criminal conviction from this District for possession with intent to distribute heroin. JACKSON also has prior convictions from New York for criminal possession of a loaded weapon, petit larceny, burglary, and robbery.

15

54.     I have reviewed SOW's criminal history and observed that SOW has criminal charges out of New Jersey for obstruction, resisting arrest, prohibited weapons, unlawful possession of handguns, assault by automobile, and receiving stolen property. SOW also has criminal charges out of New York for criminal possession of stolen property and 2nd degree robbery.

### Training and Experience Relevant to
### Drug Trafficker Phone Use

55.     Based on my training and experience gained from direct participation in investigations into the distribution and possession of controlled substances—including heroin, fentanyl, and cocaine base—I know that individuals involved in the drug trade frequently use multiple cellular phones, and the applications on smart phones like Devices 1, 2, 3, and 4 to arrange the acquisition, transportation, and distribution of controlled substances.

56.     In my training and experience, I know it is common for drug distributors to maintain multiple cellular phones as means of communications with customers and confederates, along with their sources of supply. They maintain different cell phones to allow them to avoid communicating with either their customers and/or confederates on the same phone that they speak to their sources of supply and/or family and friends.

57.     Distributors frequently use other individuals to provide transportation and accommodations while they engage in drug trafficking, often compensating those individuals with money derived from drug trafficking or with drugs. Distributors often communicate with these collaborating individuals, who many themselves distribute drugs. In the course of those communications, discussions of the sale of illegal drugs and evidence of drug storage or distribution locations may be transmitted through cell phones.

58. I believe that probable cause exists that SOW, SILIEN, BROWN, and ADEN used Devices 1, 2, 3, and 4 in connection with a drug-trafficking conspiracy and the maintenance of drug-involved premises and the devices will contain evidence relevant to the ongoing investigation of JACKSON, SOW, SILIEN, BROWN, ADEN and others.

59. Both distributors and users of controlled substances frequently retain contact information about, historical messages with, and other data regarding their sources and customers in their cellular phones. Evidence on cellular phones of controlled substance transactions often includes logs of calls, text messages (both within the phone's text messaging application and third-party applications such as WhatsApp and Facebook Messenger), contact lists, photos, and notes in various applications. The phone data frequently establishes details of specific drug transactions, such as the date, time, quantity, cost, and means of payment, including payments through applications using the phones such as those made through CashApp, Venmo, or cryptocurrency transactions. Communications stored or logged on the phones may also contain evidence of alleged debts owed to the sources of controlled substances.

60. In my training and experience, drug distributors also frequently photograph and send images of their products to users as a means of advertisement to their customers. They also frequently photograph and send images of the proceeds from drug sales. Such images may appear in messages between the distributor and users in various applications and may be stored on the device.

61. In my training and experience, drug distributors commonly have in their possession (that is, on their persons, in their vehicles, and at the residences) firearms and ammunition to protect themselves, their controlled substances, and the proceeds from distributions. Those firearms often include pistols, revolvers, rifles, and shotguns, and they occasionally include

17

machine guns, silencers, or other restricted weapons. Drug distributors will also frequently trade controlled substances for other goods, to include firearms. Often times cellular telephones will contain evidence of the possession of these firearms or weapons, including messages regarding the acquisition or trade of firearms and photos depicting firearms or individuals possessing firearms.

62. In my training and experience, drug distributors and users frequently use their smart phones to navigate, including to and from distribution locations and/or source cities, using global positioning system (GPS) access. Most current cellular phones have a mapping application that provides location information and directions for navigation, and additional navigation applications are available for download. Users frequently take screenshots of a map application to show others where they are or where to meet and send the images via a messaging application; alternatively, some mapping applications allow the user to send location data directly through a "pin drop." Evidence of drug storage or distribution locations therefore may be found in a phone's mapping applications, image database, and messaging applications.

63. In my training and experience, individuals who illegally obtain, possess, sell, and trade firearms frequently use their smart phones to photograph or discuss their firearms. From past investigations, I know individuals to take pictures of firearms using their smart phones and then send said pictures to potential purchasers so the purchasers can decide which firearm(s) they want.

64. Based on my training and experience, I know Devices 1, 2, 3, and 4 to be a smart phone that includes the features outlined above.

## TECHNICAL TERMS

65.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone or cell phone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable

19

storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a

20

computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet,

21

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

66.     Based on my training, experience, and research, I know that Devices 1, 2, 3, and 4

have capabilities that allow them to serve as a wireless telephone, digital camera, portable media

player, GPS navigation device, and PDA, especially when connected to wi-fi using IP addresses,

to access the Internet. In my training and experience, examining data stored on devices of this

type can uncover, among other things, evidence that reveals or suggests who possessed or used

the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

67.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on a device. This information can

sometimes be recovered with forensics tools.

68.     *Forensic evidence.* As further described in Attachments B-1 and B-2, this

application seeks permission to locate not only electronically stored information that might serve

as direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how the Device was used, the purpose of its use, who used it, and when. There is

probable cause to believe that this forensic electronic evidence might be on the Device because:

> a.  Data on the storage medium can provide evidence of a file that was once on the
>
>     storage medium but has since been deleted or edited, or of a deleted portion of a
>
>     file (such as a paragraph that has been deleted from a word processing file).

22

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.   I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a

23

storage medium for evidence of crime. From my training and experience, I

believe that an electronic device used to commit a crime of this type may contain:

data that is evidence of how the electronic device was used; data that was sent or

received; and other records that indicate the nature of the offense.

69.     *Nature of examination.* Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit the examination of Devices 1, 2, 3, and

4 consistent with the warrant. The examination may require authorities to employ techniques,

including but not limited to computer-assisted scans of the entire medium, that might expose

many parts of the Device to human inspection in order to determine whether it is evidence

described by the warrant.

70.     *Manner of execution.* Because this warrant seeks only permission to examine a

device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the

Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

71.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachments A-1, A-2, A-3, and A-4 to

seek the items described in Attachments B-1 and B-2.

Respectfully submitted,

Durwin Ellerman
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me this *13* day of August, 2025.

HON. KEVIN J. DOYLE
United States Magistrate Judge